**MAKOR ISSUES & RIGHTS, LTD., et al., Plaintiffs–Appellants,**

v.

**TELLABS, INC., et al., Defendants–Appellees.**

No. 04–1687.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 2005.

Decided Jan. 25, 2006.

Richard H. Weiss, Milberg, Weiss, Bershad & Schulman, New York, NY, Arthur R. Miller (argued), Cambridge, MA, Lori A. Fanning, Miller, Faucher & Cafferty, Chicago, IL, for Plaintiff-Appellant.

David F. Graham (argued), Sidley Austin Brown & Wood, Chicago, IL, for Defendant-Appellee.

Before RIPPLE, WOOD, and SYKES, Circuit Judges.

WOOD, Circuit Judge.

This class action against Tellabs, Inc., a manufacturer of specialized equipment used in fiber optic cable networks, presents the first opportunity for this court to address the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b). The plaintiffs have accused Tellabs and its executives of engaging in a scheme to deceive the investing public about the true value of Tellabs's stock. The district court dismissed the plaintiffs' second amended complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), after finding that the plaintiffs had failed to meet the PSLRA's pleading threshold. We affirm in part and reverse in part.

I

With the aid of 27 confidential sources, the plaintiffs, a putative class of Tellabs stockholders, allege that Tellabs's fraudulent conduct began on December 11, 2000.

(We assume the truth of the well-pleaded allegations in the complaint, as we must upon review of a Rule 12(b)(6) dismissal.) See, *e.g., Harrell v. Cook,* 169 F.3d 428, 431 (7th Cir.1999). On that day, Tellabs issued a press release stating that Tellabs and Sprint had signed a multi-year, $100 million contract for one of Tellabs's next-generation products, the TITAN 6500. The release proclaimed that "[t]he TITAN 6500 system is available now." In a call to financial analysts later that day, Tellabs's Chief Executive Officer (CEO), Richard Notebaert, predicted that in addition to the contract with Sprint for the 6500, there would be "continuing growth of the TITAN 5500," referring to the 6500's predecessor. Based in part on these representations, most market analysts recommended that investors buy Tellabs's stock.

On January 23, 2001, in a press release announcing Tellabs's "record sales and earnings in the fourth quarter of 2000," Notebaert proclaimed that "customers are buying more and more Tellabs equipment." In an accompanying call to analysts, Notebaert stated that Tellabs had "set the stage for sustained growth with the successful launches of several products." Later, in response to a question, Notebaert stated, "On the 6500, demand for that product is exceeding our expectations." In another interview that day, Notebaert said, "we feel very, very good about the robust growth we're experiencing."

Continuing with these sunny assessments, on February 14, 2001, Tellabs sent a letter to stockholders, signed by Notebaert and Richard Birck, Tellabs's chairman and former CEO, that stated: "Tellabs'[s] growth is robust.... Our markets hold significant potential for sustained growth.... Our core business is performing well.... [S]ales of our TITAN 5500 digital cross-connect systems soared 56%

in 2000.... The new TITAN 6500 multi-service transport switch emerged from our laboratories in 2000, and customers are embracing it." In the annual report that accompanied this letter, Birck and Notebaert responded as follows to investors' frequently asked questions:

Q. Your core business is built on the TITAN 5500—are you worried that this product has peaked?

A. No. In 2000, TITAN 5500 revenues grew 56%, its best year so far. Although we introduced this product nearly 10 years ago, it's still going strong....

The first public glimmer that business was not quite so healthy came in March 2001. At that time, Tellabs modestly reduced its first quarter sales projections from a range of $865 million to $890 million to a range of $830 million to $865 million. This revision was attributable to lower-than-expected growth in Tellabs's CABLESPAN® business, a product unrelated to this action. As Tellabs announced this reduction, it reiterated its positive forecasts for its other products. In a conference call with analysts, Notebaert stated:

[D]emand for our core optical products, or our core networking products remains strong.... Interest in and demand for the 6500 continues to grow.... We continue to ship the 6100 and 6500 through the first quarter. We are satisfying very strong demand and growing customer demand. We are as confident as ever—that may be an understatement—about the 6500.... Tellabs will meet the adjusted revenue and earnings targets.

Notebaert maintained this upbeat tone while discussing the TITAN 5500. In response to an investor's question whether Tellabs was experiencing "any weakness [ ] at all" in demand for the 5500, Notebaert

responded, "No, we're not. We're still seeing that product continue to maintain its growth rate." Tellabs's 10–K statement for the fiscal year ended December 29, 2000, filed three months later on March 29, 2001, maintained this rosy outlook.

Nevertheless, on April 6, 2001, Tellabs reduced its first quarter sales projections once again—down to $772 million from the $830 to $865 million range it had forecast just a month earlier. Notebaert cautioned that Tellabs's customers were deploying their new equipment slowly and "exercising a high degree of prudence over every dollar spent." In the face of this downward revision, Notebaert informed investors that "everything we hear from the customers indicates that ... demand for services continues to grow." Notebaert insisted that the demand for the TITAN 6500 was "very strong" and explained that the only reason for the downward projections was that Tellabs's customers were pushing orders back from the first to the second quarter of 2001.

Less than two weeks later, Tellabs announced that sales for the first quarter were in fact $772 million. While significantly below the original projections, this still represented a 21% increase in sales over the first quarter of 2000. Nonetheless, Tellabs announced that it was abandoning one of the products it had been touting, the SALIX program, just 14 months after purchasing it for $300 million.

Despite the mixed news, analysts still thought that Tellabs was a stock worth buying. By this point, though, the company's stock price had fallen from a high of $67 per share to somewhere in the low $30 range. Over the next few months, while Tellabs's executives kept mum, the company's stock crept back up to over $38. Then, on June 19, 2001, the last day of the class period, Tellabs announced a substan-tial reduction in its second quarter projections. It had projected that sales would be between $780 and $820 million, but it now revealed that its second quarter revenues would amount to only $500 million. On yet another conference call, Notebaert informed investors that the reduction was almost entirely because of an enormous reduction in TITAN 5500 sales. The next day, Tellabs's stock price plunged to $15.87 per share.

On December 3, 2002, the plaintiffs filed their first complaint against Tellabs and 10 of its executives. The complaint alleged that Tellabs's executives knowingly lied to the public, in the following particular ways: (1) they had informed the market that the TITAN 6500 was available when in fact it was not; (2) they had represented that demand for the TITAN 5500 was stable or even growing when in fact they knew that it was waning; (3) they said that the SALIX line of products was bound for success when in fact Tellabs knew that it was bound to fail; (4) they portrayed Tellabs's fourth quarter revenues and earnings for 2000 as stellar when in fact they were fraudulently inflated; and (5) they announced that Tellabs's future earnings would be greater than actually expected.

The defendants moved to dismiss the complaint for failure to state a claim. The district court granted the motion, with leave to amend, finding that (1) all but one of Tellabs's projections were accompanied by meaningful cautionary language, and thus fell within the scope of the "safe harbor" provisions of the PSLRA; (2) the plaintiffs had failed to offer particularized facts to support their claim that Tellabs misrepresented its fourth quarter 2000 results; and (3) the complaint failed adequately to allege that the defendants met the scienter standard for securities fraud, which requires that they likely intended "to deceive, manipulate, or defraud." See

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

On July 3, 2003, the plaintiffs filed a second amended complaint, bolstering their allegations with references to 27 confidential sources, shortening the list of defendants by four, eliminating a few of their weaker claims, and adding more specific scienter allegations against each of the remaining defendants. While the district court found that a number of the statements are actionable, it nonetheless dismissed again because, it thought, the plaintiffs still had failed adequately to allege scienter for any of the defendants. The court echoed its earlier holding that the PSLRA safe harbor provision protected Tellabs's forecasts. The plaintiffs appeal, arguing that (1) some of the statements the court dismissed as "mere puffery" are legally actionable; (2) their complaint provided enough detail to support a strong inference of scienter for each of the defendants; and (3) the disclaimer accompanying Tellabs's forecasts was insufficient and therefore Tellabs could not rely on the PSLRA's safe harbor provision.

## II

The plaintiffs' complaint alleges three distinct statutory violations. First, the plaintiffs contend that Tellabs, as a company, and Birck and Notebaert, as individuals, violated § 10(b) of the Securities Exchange Act of 1934, codified in 15 U.S.C. § 78j, and Securities Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5. Second, the complaint alleges that Notebaert, Birck, and two other Tellabs executives were "control persons" and therefore liable under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78(t), for the corporation's fraudulent acts. Finally, the plaintiffs allege that Birck engaged in illegal insider trading in violation of § 20A

of the Act, 15 U.S.C. § 78t–1. The control person and insider-trading allegations require an underlying securities fraud violation. Because the district court rejected the plaintiffs' underlying securities fraud complaint, it also dismissed these attendant claims. We as always review the district court's decision to dismiss under Rule 12(b)(6) *de novo,* see *In re: Cerner Corp. Sec. Litig.,* 425 F.3d 1079, 1083 (8th Cir. 2005), as well as its interpretation of the heightened pleading requirements of the PSLRA.

Unlike a run-of-the-mill complaint, which will survive a motion to dismiss for failure to state a claim so long as it is "possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief," *Sanville v. McCaughtry,* 266 F.3d 724, 732 (7th Cir. 2001) (quotation omitted), the PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading—one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b). See, *e.g., In re: Rockefeller Center Props., Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir.2002) (noting that the PSLRA "imposes another layer of factual particularity to allegations of securities fraud"). Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1), (2). In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to con-

vince a court at the outset that the defendants likely intended "to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 194 & n. 12, 96 S.Ct. 1375. Most of the debate within the courts of appeals has concerned the second requirement: how much, in the way of factual detail in the pleadings, is sufficient to create this "strong inference" of the requisite scienter? Before we address that question, however, it is helpful to review Tellabs's actionable statements and the district court's assessment of them.

### A

Passed in the 1930s in reaction to the stock market crash of 1929 and the Great Depression, the modern securities laws were designed, according to the Supreme Court, to "substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). " 'There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy.' " *Basic Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934)). Under § 10(b) of the Securities Exchange Act and Rule 10b–5, a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages. See, *e.g.*, *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).

■ The first pleading hurdle of the PSLRA requires the plaintiff to support with particularity the first two elements noted above: the falsity of the statement of fact or the omission, and its materiality. It is not enough simply to allege in general that the defendant's statement was false and material. Looking first at the "falsity" requirement, we see that the PSLRA requires the complaint to specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief. See 15 U.S.C. § 78u–4(b)(1). Although § 78u–4(b)(1) requires a complaint to state *"all* facts on which that belief is formed," this does not mean that a complaint automatically survives if it lists "all" of the facts supporting the plaintiff's belief. Nor does it mean that if the plaintiff alleges sufficient facts but leaves out a redundant detail, the court must dismiss the complaint. As the Second Circuit has held, such exactitude would render the statute meaningless:

> Reading "all" literally would produce illogical results that Congress cannot have intended. Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.

*Novak v. Kasaks*, 216 F.3d 300, 314 n. 1 (2d Cir.2000). We agree with the Second Circuit that the relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.*

■ Often, as is the case here, plaintiffs rely at the pleading stage on confidential sources to meet this requirement, creating yet another knotty complication. Does the identity of the plaintiffs' sources necessarily fall within the facts required to support a reasonable belief that the defendant has committed fraud? Other circuit courts have said that it does not. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir.2004); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351–54 (5th Cir.2002); *In re: Cabletron Systems, Inc.*, 311 F.3d 11, 29–31 (1st Cir.2002); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 667–68 (8th Cir.2001); *Novak*, 216 F.3d at 314. We agree with our colleagues that it would be too much to require plaintiffs to provide "name, rank, and serial number" for each of these sources. They must, however, describe their sources with sufficient particularity "to support the probability that a person in the position occupied by the source would possess the information alleged," *Novak*, 216 F.3d at 314, or in the alternative provide other evidence to support their allegations. This standard protects the privacy of the sources while still ensuring that the court has enough information to assess the soundness of the plaintiffs' allegations. A bright line rule obliging the plaintiffs to reveal their sources has the potential to deter informants from exposing malfeasance. Such a rule might also invite retaliation. Nonetheless, plaintiffs must still provide significant detail about their informants. If the descriptions indicate that the sources would not have access to, or knowledge of, the facts underlying the allegations, the allegations would be insufficient.

■ Turning to the materiality requirement, we note initially that materiality depends upon the facts. It is necessary to examine "the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240, 108 S.Ct. 978. As the Fourth Circuit has clarified, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir.1999); see also *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.1995) (finding that materiality exists when "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information"). The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material. See *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir.1997) ("Mere sales puffery is not actionable under Rule 10b–5.").

■ With these principles in mind, we turn to the plaintiffs' allegations against Notebaert and Birck. The plaintiffs' allegations fall into four categories: (1) statements overstating the demand for the TITAN 5500; (2) statements concerning the availability of the TITAN 6500; (3) statements regarding Tellabs's financials for the fourth quarter of 2000; and (4) statements exaggerating Tellabs's earnings and revenue projections. We begin with the question whether the complaint adequately alleged that the statements were misleading. It identifies 27 confidential sources, noting the position each held within Tellabs and the dates of each person's employment with the company. *Cf. Chubb*

*Corp.*, 394 F.3d at 148 (finding problematic the complaint's failure to detail when the plaintiffs' confidential sources worked for the defendant). The list includes former managers and high-level executives. The descriptions provided in the complaint reveal that many of the informants were in a position to provide reliable information concerning whether Birck's and Notebaert's statements were false and material and whether Birck and Notebaert knew this to be the case.

By January 2001, the complaint asserts, demand for Tellabs's "best seller"—the TITAN 5500—was drying up. Verizon, Tellabs's largest customer, reduced its orders for the TITAN 5500 by roughly 25% in late 2000 and by roughly 50% in January 2001. Customers in Latin America and Central America were no longer buying the product. By late 2000, according to a couple of the confidential sources, Tellabs had excess TITAN 5500s on hand because of the lack of demand. One confidential source informed the plaintiffs that Tellabs paid Probe Research, an outside company, $100,000 to forecast demand for the TITAN 5500. Completed "in or about early 2001," the report showed that the market need for the TITAN 5500 was evaporating. Based on this research, Tellabs's marketing strategy department distributed an internal memorandum that concluded that revenue from the TITAN 5500 would decline by about $400 million.

Even taking into account this declining demand, we agree with the district court that some of the statements attributed to Notebaert during this time amount to no more than puffery. It is doubtful that an investor would rely on statements like "we feel very, very good about the robust growth we're experiencing," or "demand for our core optical products ... remains strong." These vague comments did not identify the TITAN 5500 in particular and

were unlikely to induce an investor to purchase Tellabs's stock.

Other statements are more troublesome, especially when viewed against the backdrop of the company's upbeat attitude. On March 8, 2001, in response to a question from a Deutsche Bank analyst about whether Tellabs was experiencing any weakness in TITAN 5500 sales, Notebaert responded: "We're still seeing that product continue to *maintain its growth rate;* it's still experiencing strong acceptance." (Emphasis added.) In context, this went well beyond puffery: it was a direct response to an analyst's inquiry about a possible decline in TITAN 5500 sales. It is reasonable that an analyst or investor would take Notebaert at his word, and it is misleading to describe a decline as equivalent to a continued growth rate.

Similarly, in Tellabs's 2000 Annual Report, published in February 2001, Notebaert and Birck responded to a frequently asked question ("[A]re you worried that [the TITAN 5500] has peaked?") by stating flatly, "No.... Although we introduced the product nearly 10 years ago, it's still going strong." Perhaps in a different context this statement would amount to puffery, but its place in the "frequently asked questions" section of the Annual Report suggests that the answer was particularly important to investors. It would be reasonable for an investor to rely on the statement, believing that sales for the TITAN 5500 were "still going strong."

As with the statements pertaining to the TITAN 5500, some of the statements concerning the TITAN 6500 are not the type on which an investor would reasonably rely. Notebaert's statement, for example, that "[o]n the 6500, demand for that product is exceeding our expectations" essentially is meaningless. As one court has put it, "[i]t is hard to imagine a more subjective or vague statement than 'ex-

ceeded our expectations.' This is precisely the type of statement that the marketplace views as pure hype, and accordingly discounts entirely." *In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 331 (D.Mass. 2002).

As the district court found, however, some of Tellabs's statements regarding the TITAN 6500 crossed into the realm of material falsity. According to the complaint, the TITAN 6500 was not available for delivery until well after the class period ended. Yet on December 11, 2000, the first day of the class period, Tellabs flatly stated, "The TITAN 6500 system is available now." On March 8, 2001, Notebaert told analysts, "Interest in and demand for the 6500 continues to grow.... We continue to ship the ... 6500 through the first quarter. We are satisfying very strong demand and growing customer demand." Again, on April 6, 2001, in response to an analyst's question whether Tellabs was still on track to recognize TITAN 6500 revenue in the second quarter, Notebaert stated, "we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong." These statements are particular, specific, and, according to the complaint, completely false. The plaintiffs have alleged with sufficient particularity that some of Notebaert's statements regarding the TITAN 6500 were material and false.

The plaintiffs further allege that the defendants falsely represented Tellabs's financial results for the fourth quarter of 2000. Although the amended complaint alleges that Tellabs inflated its fourth quarter numbers through the use of fictitious sales, back-dated orders, and "creative" incentives, the only allegation that the plaintiffs pleaded with sufficient particularity is the charge that Tellabs flooded

its downstream customers with unordered TITAN 5500s. This practice, known as channel stuffing, creates a short-term illusion of increased demand between the time when the company sends the extra product down the line and the time when the distributors return the unwanted excess. According to the plaintiffs' confidential sources, Tellabs had to lease extra storage space in January and February 2001 to accommodate the large number of returns.

While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them. The complaint relies on several confidential sources to support the channel stuffing allegation. For example, one source informed class counsel that Verizon's chairman had asked Tellabs to stop providing Verizon, Tellabs's largest customer, with products that Verizon did not request or require. Given the consistency and specificity of the plaintiffs' channel stuffing allegations, the district court found, and we agree, that the amended complaint provided sufficient detail of channel stuffing to overcome the PSLRA's material falsity hurdle.

Finally, the plaintiffs identify a series of what turned out to be overstated revenue projections made by Tellabs, which, according to the complaint, were meant to induce investors to purchase Tellabs stock. The district court found that because Tellabs included disclaimers along with each of these projections, the statements fell within the PSLRA's safe harbor provision. "The statutory safe harbor forecloses liability if a forward-looking statement 'is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-look-

ing statement.'" *Asher v. Baxter Intern. Inc.*, 377 F.3d 727, 729 (7th Cir.2004) (quoting 15 U.S.C. § 77z–2(c)(1)(A)(i)). Here, Tellabs accompanied each projection with the following statement:

Actual results may differ from the results discussed in the forward-looking statements. Factors that might cause such a difference include, but are not limited to, risks associated with introducing new products, entering new markets, availability of resources, competitive response, and a downturn in the telecommunications industry. The company undertakes no obligation to revise or update these forward-looking statements to reflect events or circumstances after today or to reflect the occurrence of unanticipated events.

After the district court's decision, this court decided *Asher*, 377 F.3d 727, which confronted the issue of what constitutes a "meaningful cautionary statement." In *Asher*, the defendant listed a host of consequential variables in its safe harbor disclaimer similar to those mentioned by Tellabs. The *Asher* plaintiffs argued that the defendant's disclaimer was mere boilerplate, while the defendant, Baxter International, argued that it need not provide greater detail, as the disclaimer mentioned each of its business segments. *Id.* at 732–33. We rejected both extremes:

Plaintiffs say that Baxter's cautions were boilerplate, but they aren't. Statements along the lines of "all businesses are risky" or "the future lies ahead" come to nothing other than caveat emptor (which isn't enough); these statements, by contrast, at least included Baxter-specific information and highlighted some parts of the business that might cause problems. For its part, Baxter says that mentioning these business segments demonstrates that the caution is sufficient; but this also is

wrong, because then any issuer could list its lines of business, say "we could have problems in any of these," and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight. *Id.* at 733. We concluded that a disclaimer falls within the safe harbor provision only if it mentions "those sources of variance that (at the time of the projection) were the principal or important risks." *Id.* at 734. Since we could not assess this question on the pleadings and record then available to us, we remanded the case to district court.

According to the complaint, the defendants knew at the time they made the projections that demand for the TITAN 5500 was drying up and that production of the TITAN 6500 was far behind schedule. Tellabs argues that the disclaimer covered these contingencies by warning investors that a "downturn in the telecommunications industry" could affect its forecasts and that there are "risks associated with introducing new products." Without doubt, these generalized statements encompass Tellabs's troubles with the TITAN 5500 and 6500; they also encompass a whole world of other possible contingencies. The breadth of these warnings makes it impossible for us to conclude that they meaningfully described "the principal or important risks" facing Tellabs at the time it made the projections. Indeed, this level of generality exemplifies the useless *caveat emptor* boilerplate we criticized in *Asher*. See *id.* at 733. Accordingly, we find that Tellabs's warnings were not particularized enough for it to claim shelter under the PSLRA's safe harbor provision.

In sum, we agree with the district court that some of the defendants' statements regarding the TITAN 5500 and 6500 amounted to nothing more than immaterial puffery. The defendants do not contest

the district court's finding that other statements made in connection with these products and the company's past results are actionable. We too conclude that this is the case. Finally, we disagree with the district court's conclusion that Tellabs was entitled to take advantage of the safe harbor; to the contrary, we find that it did not accompany its financial projections with a "meaningful cautionary statement."

**B**

All of this will not affect the ultimate outcome of this case, however, unless the plaintiffs can clear another, even more arduous, hurdle: adequately alleging scienter. In passing the PSLRA, some in Congress recorded their belief that Federal Rule of Civil Procedure 9(b) had "not prevented abuse of the securities laws by private litigants." H.R. Conf. Rep. No. 104–369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. To address this perceived abuse, the PSLRA changes the threshold pleading rules by requiring that the complaint "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ According to the Ninth Circuit, in enacting § 78u–4(b)(2), Congress also raised the substantive state of mind requirement for securities fraud allegations. See *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 979 (9th Cir.1999) (determining that a plaintiff must allege facts that create a strong inference of "deliberate or conscious recklessness" or a "degree of recklessness that strongly suggests actual intent"). We are not persuaded by this position. Prior to the passage of the PSLRA, every circuit to consider the substantive scienter standard—including the Ninth—had held that a showing of reck-lessness was sufficient to allege scienter. See *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir.1990); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989); *Van Dyke v. Coburn Enter., Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814–15 (11th Cir.1989); *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir.1982); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (*en banc*); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023–25 (6th Cir.1979); *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir.1978) (assuming without deciding that recklessness was sufficient); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–47 (2d Cir. 1978); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977). Since § 78u–4(b)(2) refers to the "required state of mind," it seems more likely to us that Congress did not object to the substance of the state of mind standard found in the law before the passage of the Act. If Congress had wanted to impose a more stringent scienter standard, we believe that it would have done so explicitly, just as it expressly changed the pleading requirements. Save the Ninth Circuit, all other circuits to have considered this issue have concluded that the substance remained unchanged. Accordingly, we will apply the same scienter standard now as we did prior to the passage of the PSLRA: "an extreme departure from the standards of ordinary care, [ ] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp.*, 553 F.2d at 1045 (quotation removed) (applying the standard to omissions); see also *SEC v. Jakubowski*, 150 F.3d 675, 681–82 (7th Cir. 1998) (applying the *Sundstrand* scienter standard in a case decided after the passage of the PSLRA).

While § 78u–4(b)(2) did not impose a more stringent substantive scienter standard, it did unequivocally raise the bar for pleading scienter. Not only must plaintiffs meet a particularity requirement; they must also meet a substantive requirement by pleading sufficient facts to create "a strong inference" of scienter. Congress did not, unfortunately, throw much light on what facts will suffice to create such an inference. Currently three different approaches toward the way to demonstrate the required "strong inference" exist among the courts of appeals. The Second and Third Circuits take the position that the statute adopted the Second Circuit's pre-PSLRA pleading standard for scienter, "and thus plaintiffs may continue to state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious misbehavior." *Novak*, 216 F.3d at 309–10; *In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530–35 (3d Cir.1999). The Ninth and Eleventh Circuits disagree, believing that Congress considered, but ultimately rejected the Second Circuit's approach, opting instead for a more onerous burden. See *Silicon Graphics*, 183 F.3d at 974 ("Congress intended to elevate the pleading requirement above the Second Circuit standard requiring plaintiffs merely to provide facts showing simple recklessness or a motive to commit fraud and opportunity to do so."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1286 (11th Cir.1999) ("[B]ecause the clear purpose of the [PSLRA] was to curb abusive securities litigation, and because we believe that the motive and opportunity analysis is inconsistent with that purpose, we decline to adopt it.").

The remaining six circuits that have considered this issue take a middle ground, reasoning that "Congress chose neither to adopt nor reject particular methods of pleading scienter—such as alleging facts showing motive and opportunity—but instead only required plaintiffs to plead facts that together establish a strong inference of scienter." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 345 (4th Cir.2003); accord *Green Tree*, 270 F.3d at 659–60 (8th Cir.2001); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 411–12 (5th Cir. 2001); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1261–63 (10th Cir. 2001); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550–52 (6th Cir.2001) (*en banc*); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195–97 (1st Cir.1999). We find this position persuasive. While some legislators may have thought that they were adopting the Second Circuit's pre-PSLRA approach, others may have envisioned a stricter standard, and still others may have had yet another view. See *Advanta Corp.*, 180 F.3d at 533 (reviewing the PSLRA's legislative history and concluding that it is "contradictory and inconclusive"). In any event, "[l]egislation is an objective text approved in constitutionally prescribed ways; its scope is not limited by the cerebrations of those who voted for or signed it into law." *United States v. Mitra*, 405 F.3d 492, 495 (7th Cir.2005). The text of the statute states only that the complaint must support "a strong inference" of scienter. Without more detailed instruction, we conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

Another concern, independent of the question of what type of information will support a finding of scienter, is the degree of imagination courts can use in divining whether a complaint creates a "strong inference." The Sixth Circuit has said that "the strong inference requirement creates

a situation in which 'plaintiffs are entitled only to the most plausible of competing inferences,' but that it does not mandate that the inference be 'irrefutable.'" *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir.2004) (quoting *Helwig*, 251 F.3d at 553). As the Sixth Circuit itself has hinted, however, this standard could potentially infringe upon plaintiffs' Seventh Amendment rights. See *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 n. 25 (6th Cir.2005) ("One might argue that for cases where a juror could conclude that the facts pleaded show scienter, but that conclusion would not be the most plausible of competing inferences, a Seventh Amendment problem is presented.").

■ While we express no view on whether the Sixth Circuit's approach is in fact unconstitutional, we think it wiser to adopt an approach that cannot be misunderstood as a usurpation of the jury's role. Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent. "Faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for us to make a determination as to which inference will ultimately prevail, lest we invade the traditional role of the factfinder." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir.2003). "Scienter is normally a factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." *Cerner Corp.*, 425 F.3d at 1084–85. If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal; the complaint would fail as a matter of law to meet the requirements of § 78u–4(b)(2). See *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir.2003) ("We [ ] understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.").

■ The final piece of the scienter puzzle is whether the scienter allegations made against one defendant can be imputed to all other defendants in the same action. The so-called "group pleading presumption" is "premised on the assumption that in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Bridgestone Corp.*, 399 F.3d at 689. There is significant debate among the various circuits on the question whether the group pleading doctrine survived the heightened pleading requirements of the PSLRA, see *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004); *Cabletron Sys.*, 311 F.3d at 40, as well as among the district courts of this circuit. Compare *Danis v. USN Communications, Inc.*, 73 F.Supp.2d 923, 939 n. 9 (N.D.Ill.1999) (concluding that group pleading continues after the PSLRA) with *Chu v. Sabratek Corp.*, 100 F.Supp.2d 827, 835–37 (N.D.Ill.2000) (concluding that it does not). The answer, in our view, lies in the language of the statute. Section 78u–4(b)(2) requires that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." As the Fifth Circuit recently held, "PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is

inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions." *Southland,* 365 F.3d at 365–66. See also *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th Cir.2004) ("[W]e believe that the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations."). We find this reasoning persuasive. While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases.

■ The district court found that the plaintiffs' complaint adequately alleged that Notebaert and Birck made false or misleading material statements in regards to the TITAN 5500, the TITAN 6500, and the company's past results. We have drawn the same conclusion with respect to Tellabs's future projections. We can now assess whether the complaint states, with respect to each of these actionable statements, facts that give rise to a strong inference of scienter. We conclude that the complaint meets this threshold for Notebaert, but not for Birck. Since Notebaert was acting within the scope of his position as CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporate entity Tellabs. See *United States v. One Parcel of Land Located at 7326 Highway 45 North,* 965 F.2d 311, 316 (7th Cir.1992) ("Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation.").

■ First, as for the TITAN 5500, the Probe Research report revealed, "in or about early 2001," that the market for the TITAN 5500 had faded. In reaction to this news, Tellabs's marketing strategy department concluded that revenue from the TITAN 5500 would decline by about $400 million. According to one confidential source, a Tellabs market analyst who worked for the company throughout the class period, internal reports revealed by March 2001 that the market for the 5500 was drying up. Yet, in April 2001, Notebaert told financial analysts that "everything we hear from the customers indicates that our in-user demand for services continues to grow." While it is conceivable that Notebaert had yet to see the reports suggesting his company was in trouble ("in or about early 2001" is somewhat vague), the plaintiffs have provided enough for a reasonable person to infer that Notebaert knew that his statements were false. According to another confidential source, a Tellabs business manager, Notebaert stayed on top of the company's financial health through weekly conversations with his fellow executives. Given the significance of the TITAN 5500 and the number of reports suggesting that it was in trouble, we find it sufficiently probable that Notebaert had information suggesting that his statements were false. See *Green Tree,* 270 F.3d at 665 ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

■ Creating the required strong inference that Birck knew about the 5500's market weakness is more difficult. On the one hand, he signed a letter in February 2001 informing investors that the 5500 was

**604**

"still going strong." Plaintiffs also alleged generally that he regularly attended "town hall meetings" with Notebaert, that he (with Notebaert) had his "hands on the pulse," and that he knew the status of each product. Furthermore, Birck sold 80,000 Tellabs shares in the first week of February 2001, which the plaintiffs suggest supplies circumstantial evidence that he knew that his February statement was false. On the other hand, undermining the inference of Birck's knowledge is the fact that it was not until March 2001 that the TITAN 5500's declining status was obvious, and Birck's last public comment regarding the 5500 was that February letter. This particular insider trading evidence also adds little to the overall picture. While insider trading may be sufficient circumstantial evidence of scienter, plaintiffs must show that the sale of stock is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal quotation omitted); see also *Cerner Corp.*, 425 F.3d at 1085. Here, the plaintiffs allege that Birck made a significant stock sale, but the complaint provides no information as to how this sale compared to Birck's past or subsequent trading. Indeed, while 80,000 shares may be a lot of shares, it represented only one percent of Birck's holdings. The complaint does not provide any reference point from which to judge Birck's sales, and we do not believe that the mere fact that he sold one percent of his stock necessarily establishes a strong inference of scienter. Finally, the complaint fails to allege with particularity that Birck made any actionable statements regarding the TITAN 6500.

■ While we consider it a close question, we conclude that the plaintiffs did not meet the strict PSLRA standards for pleading Birck's scienter. We thus confine the remainder of our scienter discussion with respect to the 6500 to Notebaert. According to the complaint, Notebaert made a number of false statements regarding the 6500, suggesting that it was available and being shipped, when, in fact, Tellabs did not ship a single TITAN 6500 during the class period. If it is true that the TITAN 6500 was not in fact available during the class period, it is hard to accept that Notebaert's statements were simply honest mistakes. According to a Tellabs sales director, Notebaert saw weekly sales reports and production projections. Another confidential source, a former high-level sales executive, reported that Notebaert knew that "the TITAN 6500 was not ready for deployment despite Tellabs'[s] public announcements." We conclude that the plaintiffs have pleaded sufficient facts to "giv[e] rise to a strong inference," 15 U.S.C. § 78u–4(b)(2), that Notebaert knowingly lied when he informed investors that the 6500 was "available now" and was "being shipped."

■ Although both Birck and Notebaert signed Tellabs's 10–K for the fourth quarter of 2000, once again the complaint does not contain enough information to create a strong inference that Birck recklessly disregarded the truth of Tellabs's financial health. According to the complaint, Tellabs fabricated the appearance of demand through channel stuffing. Although Birck should have assured himself that the numbers being represented were accurate, his trust in his CEO does not constitute the level of recklessness that the statute requires. The plaintiffs do, however, allege sufficient facts to suggest that Notebaert was aware of the channel stuffing. Indeed, a former senior business manager at Tellabs informed the plaintiffs that Notebaert "worked directly with Tellabs'[s] sales personnel" to effect

the channel stuffing. Another confidential source, a high-level sales executive, admitted that his employees fabricated purchase orders for products that customers had not ordered. He claimed that Notebaert "unquestionably knew" about the channel stuffing. As with the TITAN 5500 and 6500, we find that the complaint contains enough detail to establish a strong inference that Notebaert knew of the channel stuffing and therefore knew Tellabs had exaggerated its fourth quarter 2000 revenues.

■ Finally, since the allegedly overstated revenue projections rest on the company's statements that its products were doing better than they actually were, the scienter for those alleged misrepresentations serves as sufficient circumstantial evidence of scienter here. Thus, the complaint is sufficient to state a claim that Notebaert, but not Birck, recklessly disclosed overstated projections.

### III

■ Both the Securities Act of 1933 and the Securities Exchange Act of 1934 impose liability not only on the person who actually commits the securities law violation, but also on the persons who "directly or indirectly" control the violator. See 15 U.S.C. § 78t(a). Thus, the plaintiffs' claims against Notebaert, Birck, and the other Tellabs executives for controlling person liability under § 78t(a) survive because the complaint adequately alleges a complaint against Tellabs, a "person" these individuals allegedly controlled. See *In re Stone & Webster, Inc. Sec. Litig.*, 424 F.3d 24, 27 (1st Cir.2005) (holding that "it is an essential element of the § 20(a) controlling person claims [in that case] ... that plaintiffs show a Rule 10b–5 violation by the controlled entity"). While this is something of a back door to liability, given our finding that the complaint adequately al-

leges only that Notebaert acted with scienter, § 78t(a) allows a defendant to nullify control person liability by proving that he acted in "good faith." If, in the end, the plaintiffs are able to sustain a charge against Tellabs, Birck and the other executives will have an opportunity to prove that they acted in good faith.

■ Likewise, the plaintiffs' claim against Birck for insider trading survives. A private cause of action exists under § 20A of the Securities Exchange Act against persons who purchase or sell a security "while in possession of material, nonpublic information." See 15 U.S.C. § 78t–1(a). To create potential liability under § 20A, the plaintiffs must prove an independent violation of "this chapter or the rules or regulations thereunder." *Id.* In other words, § 20A claims are "derivative, requiring proof of a separate underlying violation of the Exchange Act." *Advanta Corp.*, 180 F.3d at 541. Thus, because Birck may be liable as a control person under § 78t(a), it is premature to dismiss the plaintiffs' § 20A allegation against him.

### IV

For these reasons, we AFFIRM in part and REVERSE in part the judgment of the district court, and REMAND for further proceedings consistent with this opinion.